# United States District Court
### for the
### Eastern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| | ) | |
| JEREMIAH I'AMAFANA SALANOA | ) | 2:25-mj-0042 JDP |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

**FILED**

Feb 24, 2025

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

SEALED

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____April 16, 2024_____ in the county of _____Solano_____ in the _____Eastern_____ District of _____California_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with intent to distribute and distribution of controlled substances |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet and incorporated here by reference.

_____/s/ Nathan Cernat_____
*Complainant's signature*

_____Nathan Cernat, FBI SA_____
*Printed name and title*

Sworn to me and signed via telephone.

Date: _____February 24, 2025_____

_____
*Judge's signature*

City and state: _____Sacramento, California_____    _____Jeremy D. Peterson, U.S. Magistrate Judge_____
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF APPLICATIONS UNDER RULE 41 FOR WARRANTS TO SEARCH AND SEIZE AND UNDER RULE 4 FOR A WARRANT TO ARREST**

## I.    INTRODUCTION

I, Nathan Cernat, being first duly sworn, hereby depose and state as follows:

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following people, premises, and property:

| Attachment | Target |
|---|---|
| A-1 | JEREMIAH I'AMAFANA SALANOA ("SALANOA") |
| A-2 | ESTRELLA GISELLE SAURI SILVA ("E. SILVA") |
| A-3 | 616 Grant Street, Vallejo, CA 94590 ("SALANOA'S RESIDENCE") |
| A-4 | A White Buick, bearing the California License Plate 9HZC045 ("E. SILVA'S VEHICLE") |
| A-5 | A Black Mercedes, bearing the California License Plate 9LUF897 ("SALANOA'S VEHICLE") |

2.     These people and property are further described in Attachments A-1 through A-5.  The applications seek to search them for the things described in Attachments B-1 through B-5.  This affidavit also supports my application for an arrest warrant of JEREMIAH I'AMAFANA SALANOA ("SALANOA").

## II.    AGENT BACKGROUND

3.     I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since April 2015.  As such, I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.  I am currently assigned to the FBI's Sacramento Division, Vacaville Resident Agency, where I work as part of the FBI's Solano County Violent Crime Task Force.  In this role, I am responsible for investigating a variety of criminal matters, to include violations of the Firearms Act, illegal possession and distribution of controlled substances, and violent criminal enterprises such as street gangs and organized crime.

4.     I was trained as an FBI Special Agent at the FBI Academy in Quantico, Virginia.  During my training, I received training in Title 21 of the United States Code, including Sections 841(a)(1) and

846, conspiracy to distribute and possession with intent to distribute controlled and/or counterfeit substances, as well as 18 U.S.C. Section 922(a)(1)(A), illegal firearms trafficking.  During my employment as an FBI Special Agent, I have participated in numerous criminal investigations involving the illegal trafficking of firearms and narcotics.  I have also participated in numerous investigations involving the use of federal and state search warrants to collect evidence, including firearms and controlled substances, the seizure of narcotics-related records, and other types of evidence that document the activities of criminal organizations in both the manufacturing and distribution of firearms and controlled substances.  To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources including physical and electronic surveillance, various types of infiltration (including informants and cooperating sources), pen register and trap and trace devices, telephone tracking devices, mail covers, pole cameras, stationary video recording vehicles, wire intercepts, audio and audio/video recording devices.

5.      Through these investigations, my training and experience, and conversations with other agents and law enforcement personnel, I have become familiar with the methods used by organized criminal enterprises, drug trafficking organizations, and street gangs to smuggle and safeguard controlled substances and firearms, to distribute, manufacture, and transport controlled substances and firearms, and to collect and launder related proceeds.

6.      I am aware, from training and experience, that individuals engaged in firearms and drug trafficking commonly use coded language to refer to drugs and drug transactions.  Firearms and drug traffickers specifically use coded language in an effort to evade law enforcement by seemingly concealing the true nature of their discussions and actions.

7.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

8.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841 and 846, conspiracy to distribute and possession with intent to distribute controlled and/or counterfeit substances, and 18 U.S.C.

1   § 922(a)(1)(A), illegal firearms trafficking, have been committed by JEREMIAH I'AMAFANA

2   SALANOA ("SALANOA").  Collectively the violations described above will be referred to as the

3   "TARGET OFENCES."  There is also probable cause to search the people and property described in

4   Attachments A-1 through A-5 for evidence and instrumentalities of these crimes further described in

5   Attachments B-1 through B-5.

6                              II.        **PROBABLE CAUSE**

7           9.      The United States Government, and the FBI specifically, is investigating LEO ALONSO-

8   MEDINA, CARLOS HIGUERA-ALDANA, JEREMIAH I'AMAFANA SALANOA, DOROTEO

9   SUASTEGUI, DAVION MORGAN and other members of the Vallejo Subset Sureno street gang

10  "Brown Brotherhood," commonly referred to as BBH, for suspected firearms and controlled substance

11  trafficking in the Eastern District of California.

12          10.     There are at least two active Sureno gangs in the city of Vallejo.  They are Brown

13  Brotherhood (BBH) and Brown Crowd Locos (BCL).  Many BBH and BCL members claim Westside

14  Vallejo (WSV), meaning, they claim the west side of the city as their territory or area of operation.

15  Whereas, a rival gang, Nortenos, claim East Side Vallejo (ESV) as their territory.

16          11.     BBH is one of the oldest and largest criminal street gangs within the city of Vallejo.

17  BBH was first noticed by the Vallejo Police Department in 1991.  BBH is comprised primarily of

18  Hispanic males, although individuals of other races are accepted.  BBH is a Sureno criminal street gang

19  as they wear the color blue, utilize the number 13, and answer to the Mexican Mafia (La Eme).  BBH

20  has a "click," or group within the gang, called West Side Pee Wees (WSP).  This click was created to

21  show respect to Israel Balderas (Rivera) (aka Pee Wee), a BBH gang member who was sentenced to

22  prison for a gang related homicide in 2007.  BBH members will get tattoos and tag their belongings and

23  other property with things such as: SUR, 13, XIII, X3, 3 dots, South Sider, West Side Vallejo, WSV,

24  West Side, WS, WSP, 228, and BBH.  BBH gang members, BCL gang members, and other Surenos

25  from the surrounding cities and counties have been seen cooperating and socializing together.

26          12.     Primary criminal activities of Sureno gang members have included murder, robbery,

27  extortion, drug trafficking, firearms trafficking, burglary, stolen vehicles, and victim/witness

28  intimidation.  These criminal acts, in association with, or at the direction of older gang members (also

AFFIDAVIT                                   3

known as "OG's"), are meant to instill fear and intimidation in rival gang members, as well as members of the community who live and work in the neighborhoods controlled by the gang. Solano County law enforcement agencies, including the Vallejo Police Department and the Solano County Violent Crime Task Force (SCVCTF), have conducted numerous investigations surrounding BBH and BCL gang members. These investigations have led to arrests or convictions of various members for crimes including but not limited to drug sales, felony assaults, firearms trafficking, firearm possession and murder.

13.    SCVCTF is currently working with a Confidential Human Source (CHS).[1] The CHS has provided information on various BBH gang members and has conducted multiple controlled firearm and/or drug purchases from various BBH members. This investigation began in February 2024 and has been ongoing since.

14.    On March 19, 2024, the CHS reported that an individual going by the moniker "CHUY"—later identified as SALANOA—was involved in the illegal distribution of M30 pills and other narcotics in Vallejo, CA. Based on my training and experience, I know that most of the blue M30 pills sold by drug dealers are made to look like "M-30" Oxycodone tablets but are known to be laced with fentanyl.

15.    On March 29, 2024, the CHS reported that Cruzita SILVA ("C. SILVA"), possibly residing at 620 Mark Avenue, Vallejo, CA, was connected to CHUY and other members of BBH who are involved in the illegal distribution of narcotics. The CHS reported that C. SILVA could introduce the CHS to CHUY if the CHS wanted to purchase narcotics from CHUY.

16.    On March 29, 2024, I provided the CHS a DMV picture of CRUZITA JOANNA SILVA ("C. SILVA"), DOB: XX/XX/2001, residing at 617 Mark Ave, Vallejo, CA, without any identifying

---

[1] The CHS started cooperating with the FBI in order to avoid prosecution from a state arrest. The CHS has since fulfilled his/her commitment to law enforcement and continued to cooperate with the FBI for monetary compensation. The CHS has requested the FBI's assistance with his/her immigration status in the US should it be needed in the future. However, no assistance with the CHS' immigration status has been provided to the CHS thus far. The CHS has no criminal convictions. The CHS has been arrested, but not convicted, for the following offenses: possession of a concealed firearm in a vehicle. The CHS has been an informant for the FBI since August 2022 and has been proven to be a reliable CHS thus far. The CHS' reporting has been proven to be truthful and has been independently verified by FBI agents.

information displayed and the CHS positively identified C. SILVA based on the DMV photo.

17.     On April 10, 2024, the CHS contacted C. SILVA at Instagram account "la_cruzita_707" and requested that C. SILVA connect the CHS with CHUY.  The CHS explained to C. SILVA that s/he knew that CHUY was a supplier of narcotics and that the CHS wanted to contact CHUY to purchase M30 pills.  C. SILVA told the CHS that she would talk to CHUY about it.  Later the same day C. SILVA told the CHS that she talked to CHUY and CHUY said the CHS should reach out to him via Instagram.

18.     Later the same day, the CHS contacted CHUY at Instagram account "blkboichuy" (SALANOA's Instagram) via Instagram messages and inquired if CHUY could supply the CHS with M30 pills.  CHUY offered to sell the CHS M30 pills at the price of $1200 for a "boat."  Based on my training and experience a "boat" is a slang for 1000 pills.  The CHS agreed to purchase 2000 M30 pills from CHUY for $2400 and set up the transaction for the following week.

19.     On April 14, 2024, CHUY contacted the CHS via Instagram messages and inquired about the day and time the CHS wanted to meet CHUY to purchase the M30 pills.  The CHS suggested the transaction take place on April 16, 2024, and CHUY confirmed he was available that day.

20.     On April 15, 2024, the CHS reached out to CHUY via Instagram to confirm that CHUY was still available for the transaction.  CHUY confirmed he was still available that day and instructed the CHS to meet him at 42 Harbor Way, Vallejo, CA.  CHUY also confirmed the price for 2000 M30 pills was still $2400.

### *Controlled Buy of M30 Pills from SALANOA on April 16, 2024*

21.     On April 16, 2024, the CHS purchased 2000 M30 pills from CHUY for $2400.  This controlled buy was surveilled by undercover law enforcement and the meeting between the CHS and SALANOA was surreptitiously recorded.  The CHS' vehicle and person were searched by law enforcement for contraband both before and after the controlled buy.

22.     Prior to the controlled buy, the CHS communicated with CHUY via Instagram messages to coordinate the time and place of the meeting.  The CHS later met CHUY in the parking lot of 42 Harbor Way Vallejo, CA, to purchase the narcotics.  FBI surveillance units observed CHUY arriving at

the meet location as a passenger of a white Buick sedan bearing the California License Plate number 9HZC045.  The CHS reported the driver of the white Buick was a Hispanic female in her late 20s or early 30s.  The CHS reported that upon arrival, CHUY greeted the CHS and approached the CHS' vehicle with a gray plastic bag in his hand.  CHUY got inside the CHS' vehicle, opened the bag, and let the CHS inspect the pills.  The video recording revealed that CHUY told the CHS that the pills were packaged in "hundreds" and that he brought twenty packages.  The CHS reported that s/he handed CHUY $2400 in U.S. currency and CHUY counted the cash.

23.     The video recording revealed that during their meeting CHUY offered to supply the CHS with M30 pills or any other drugs in the future.  CHUY told the CHS to reach out to him at any time.  CHUY told the CHS that if he was not available, he would send someone else to deliver the drugs to the CHS.  CHUY told the CHS he also had Marijuana products and "Guerita" at the price of $800 per ounce if the CHS would buy just one ounce.  The CHS explained that "Guerita" is a Spanish slang for cocaine.  CHUY told the CHS that since "Cruz" sent the CHS, and if the CHS would become a "consistent" customer, CHUY would drop the price of cocaine down to $750 per ounce.  CHUY and the CHS exchanged phone numbers before CHUY returned to the white Buick and left the meeting location.

24.     After the meeting, FBI surveillance units monitored the movement of the white Buick, which was last seen entering the apartment complex located on Maher Court, Vallejo, CA.  The CHS left the meeting location under constant surveillance.  The CHS met with handling agents after the controlled purchase operation and turned over the package that CHUY had given the CHS.  On June 6, 2024, the Drug Enforcement Administration (DEA) Western Laboratory conducted chemical analysis of the suspected drugs.  The DEA Western Laboratory provided a Chemical Analysis Report which revealed the drugs tested positive for fentanyl with a net weight of approximately 219.7 grams and a substance purity of approximately 2.1%.



*Figure 1: Narcotics Purchased from SALANOA on April 16, 2024.*

25. During the CHS debrief after the controlled buy, handling agents showed the CHS a DMV picture of JEREMIAH I'AMAFANA SALANOA, DOB XX/XX/2002, without any identifying information displayed, and the CHS had positively identified SALANOA as the individual going by the moniker "CHUY" who sold the CHS the M30 pills.

26. On April 17, 2024, I reviewed the DMV return for the white Buick used by SALANOA to deliver the drugs to the CHS and observed that one the registered owner for the vehicle was Estrella Giselle Sauri SILVA, DOB XX/XX/2001 ("E. SILVA"). Later the same day I provided the CHS a California DMV picture of E. SILVA, without any identifying information displayed, and the CHS had positively identified E. SILVA as the female driver of the white Buick (E. SILVA'S VEHICLE).

27. On April 18, 2024, Leo Alonso-Medina, who is a known BBH gang member in Vallejo, CA, and one of SALANOA's associates, informed the CHS that SALANOA and another BBH gang member going by the moniker "Sponge" were arrested by law enforcement that day. On April 19, 2024, C. SILVA contacted the CHS and told the CHS not to message SALANOA at the phone number SALANOA provided the CHS during their meeting. C. SILVA did not explain what happened but indicated SALANOA would later provide another phone number to the CHS.

28. I subsequently reviewed an updated criminal history for SALANO, which revealed that on April 18, 2024, SALANOA was arrested by Concord Police Department (CPD) in Vallejo, CA, on the following state charges: possession of narcotics for sale, possession of concealed firearm on person, possession of loaded firearm in a public place, possession of machinegun and obstruction of a police

officer.

29.     The SCVCTF requested that CPD provide the reports documenting the arrest of SALANOA.  I subsequently reviewed the reports provided by CPD, which revealed that on April 18, 2024, CPD Officers executed a state arrest warrant of Ernesto Missiego-Orozco ("Missiego-Orozco") for a felon in possession of a firearm violation.  Per CPD reports, Missiego-Orozco is a known Sureno gang member in the City of Concord with multiple prior arrests for assaults, weapons and narcotics related offences.  CPD Officers were aware that Missiego-Orozco was on federal probation for narcotics violations at the time of the arrest.  The arrest warrant was executed in the vicinity of 17 Tennessee Street, Vallejo, CA.  Missiego-Orozco was accompanied by SALANOA and Jose Anguiano ("Anguiano") at the time of his arrest.  All three subjects fled on foot when law enforcement approached, ignoring the lawful commands issued by the police officers.  SALANOA was carrying a dark blue backpack when initially encountered by law enforcement.  SALANOA discarded the backpack as he was running from law enforcement.  CPD officers seized and searched the backpack discarded by SALANOA and located a Glock handgun equipped with a gold auto sear, which converts the firearm into a machine gun.  CPD officers also located approximately 150 blue M30 pills, cannabis products, and approximately $8028 in SALANOA's backpack.  Anguiano discarded a firearm as he was running from law enforcement as well.  Both SALANOA and Anguiano were arrested by Concord PD officers pursuant to this incident and this case has since been filed in the Solano County Superior Court.



*Figure 2: Firearm and narcotics seized by Concord PD from SALANOA on April 18, 2024.*

30.     On May 2, 2024, this Court authorized a search warrant for SALANOA's Instagram account.  On May 21, 2024, Meta Platforms, Inc. responded to the search warrant and provided records associated with SALANOA's Instagram.  I subsequently reviewed the records provided by Meta Platforms, which revealed that from around January 2024 to May 21, 2024, SALANOA utilized his Instagram account to advertise narcotics for sale, including M30 pills.



*Figure 3: Instagram stories advertising narcotics posted by SALANOA on his Instagram account.*

31.     The review of SALANOA's Instagram records also confirmed SALANOA's association with the BBH criminal street gang.



*Figure 4: From left to right, Anguiano and SALANOA are standing next to BBH graffiti displaying BBH signs.*

32.     In the picture above, which was posted on SALANOA's Instagram account, Anguiano and SALANOA are observed standing next to a metal gate with BBH graffiti on it. It should be noted that Anguiano is displaying the letter "B" with both of his hands, while SALANOA is displaying the numerals "3" with both of his hands which is consistent with BBH gang signs. It should be noted that "200 BLK" with a location ping sign is displayed on top of the picture. Based on my conversations with local law enforcement, I am aware that BBH gang members claim the intersection of Arkansas St. and Marin St. in Vallejo, CA, as their territory. This corner is in the 200 block of Arkansas St. Other BBH members have used the number "200" in the past to show their membership or affiliation to BBH.

33.     The picture below was posted as an Instagram story on SALANOA's Instagram account. The picture depicts SALANOA and Carlos Higuera-Aldana ("Higuera-Aldana"), who is one of SALANOA associates and a fellow BBH gang member, displaying what appears to be the number "3" with their hands, which is consistent with the BBH gang signs.



*Figure 5: From left to right Higuera-Aldana and SALANOA displaying BBH gang signs.*

**Controlled Buy of M30 Pills from SALANOA on May 30, 2024.**

34.     On May 15, 2024, SALANOA reached out to the CHS via Instagram and offered to resupply the CHS with M30 pills.  The CHS declined but told SALANOA s/he would probably need to resupply the following week.

35.     On May 20, 2024, SALANOA contacted the CHS via Instagram and offered to resupply the CHS with M30 pills.  The CHS replied that s/he did not need to be resupplied that week.

36.     On May 29, 2024, the CHS contacted SALANOA via Instagram messages regarding the previously discussed purchase of M30 pills.  The CHS inquired regarding the cost of 3000 M30 pills.  SALANOA offered to sell the CHS 3000 M30 pills at the price of $3600.  SALANOA communicated with the CHS via Instagram screenshots, which disappeared after the CHS viewed the screenshot because SALANOA's Instagram account was in "Vanish Mode."  SALANOA provided the CHS with phone number 505-512-4722 (SALANOA's Cell Phone) via Instagram messages and told the CHS that this was his new cell phone number.  The CHS communicated with SALANOA via text messages to coordinate the time and location of the meeting with SALANOA.

37.     On May 30, 2024, the CHS met SALANOA in the parking lot of 42 Harbor Way,

Vallejo, CA, and purchased 3000 M30 pills for $3600. This controlled buy was surveilled by undercover law enforcement and the meeting between SALANOA and the CHS was surreptitiously recorded. The CHS' vehicle and person were searched by law enforcement for contraband both before and after the controlled buy.

38.    Prior to the meeting with the CHS, surveillance units observed SALANOA departing his residence at 120 Maher Court, Vallejo, CA, in a black Mercedes sedan, bearing the California License Plate 9LUF897 (SALANOA'S VEHICLE) and arriving in the parking lot of 42 Harbor Way, Vallejo, CA, prior to the arrival of the CHS. SALANOA directed the CHS via text messages to his location in the parking lot. Surveillance units observed the CHS parking next to SALANOA'S VEHICLE and entering the rear driver side door of the vehicle.

39.    The video recording of the transaction revealed that SALANOA was in the driver seat of SALANOA'S VEHICLE. Two other individuals were in the vehicle with SALANOA but did not participate in the transaction between SALANOA and the CHS. After greeting the CHS, the video recording captures SALANOA handing the CHS what appears to be a black plastic bag. The CHS reported that SALANOA gave him/her a black plastic bag with the handles tied up. The CHS reported that s/he untied the bag to inspect the drugs. Inside the plastic bag were three zipper boxes containing clear plastic bags with blue M30 pills. The CHS gave SALANOA $3600 for the drugs and tied up the plastic bag back the way it was. SALANOA told the CHS to reach out whenever s/he needs to resupply.

40.    The CHS left the meeting location under constant surveillance. The CHS met with agents and task force officers after the controlled purchase operation and turned over the package SALANOA had given the CHS. The suspected drugs were provided to the CHS in a black plastic bag. Inside the black plastic bag were three GLAD plastic bag boxes, each box containing ten clear plastic bags with blue M30 pills. On July 16, 2024, the DEA Western Laboratory conducted a chemical analysis of the suspected drugs. The DEA Western Laboratory provided a Chemical Analysis Report which confirmed the drugs tested positive for fentanyl with a net weight of approximately 322.5 grams and a substance purity of approximately 2.2%.



*Figure 6: Narcotics purchased from SALANOA on May 30, 2024.*

**Pertinent Communication between CHS and SALANOA**

41.     On July 5, 2024, the CHS ran into SALANOA at a party.  During their conversation, SALANOA offered to resupply the CHS with M30 pills.  SALANOA also offered to supply the CHS with methamphetamine at the price of $1100 per pound.  SALANOA told the CHS that he could supply the CHS with cocaine as well.  The CHS inquired regarding the price for a half kilogram of cocaine. SALANOA told the CHS that he was waiting for a call from his supplier with a price for half kilogram of cocaine.  During the same conversation, SALANOA offered to sell the CHS a Draco firearm for $3100.

42.     On July 8, 2024, SALANOA contacted the CHS via Instagram and offered to sell the CHS a Ruger FN handgun for $1600.  SALANOA told the CHS to ask around to see if anyone wanted to purchase the firearm.  The CHS declined to purchase the Ruger but agreed to meet SALANOA on July 9, 2024, in Vallejo, CA to purchase the previously discussed Draco for $3100 and one pound of methamphetamine for $1100.

43.     On July 9, 2024, at the direction of handling agents, the CHS contacted SALANOA via Instagram regarding the previously discussed purchase of the Draco and methamphetamine. SALANOA told the CHS that he was in possession of the methamphetamine but was still waiting for the Draco.  At the direction of handling agents, the CHS then offered to purchase the Ruger FN and one

pound of methamphetamine for $2700.  SALANOA told the CHS he was in Richmond, CA, and would not be back in Vallejo until later.  Subsequently, agents cancelled the controlled buy operation that day.  Later the same day, SALANOA contacted the CHS via Instagram direct messaging and communicated to the CHS that he would be back in Vallejo by 5:30 p.m. and would be able to meet the CHS that evening.  The CHS told SALANOA that s/he was no longer available that day.

44.  On July 10, 2024, SALANOA contacted the CHS several times via Instagram in attempts to set up a meeting with the CHS.  SALANOA told the CHS that he had already purchased the Ruger FN 5.7 and the methamphetamine for the CHS.  The CHS told SALANOA that s/he would probably be able to purchase the firearms and methamphetamine from SALANOA the following week.

45.  On July 16, 2024, the CHS communicated with SALANOA via Instagram regarding the previously discussed purchase of a firearm and one pound of methamphetamine.  SALANOA told the CHS that he (SALANOA) had already purchased the Ruger FN 5.7 firearm and one pound of methamphetamine for the CHS the previous week and wanted to meet the CHS the following day to sell the drugs and firearm to the CHS.  The CHS responded s/he was not able to meet SALANOA the following day but offered to meet SALANOA on July 18, 2024.  SALANOA told the CHS that he was going out of town for two weeks and would not be able to meet the CHS on July 18, 2024.  SALANOA told the CHS he was leaving on the morning on July 17, 2024, and wanted to meet the CHS before he left.

46.  On July 23, 2024, SALANOA reached out to the CHS both from his cell phone and via Instagram telling the CHS that he returned from his trip early and wanted to meet the CHS to complete the previously discussed transaction for one pound of methamphetamine and the Ruger FN 7.5 firearm.  The CHS told SALANOA that s/he would not have the funds to complete the transaction until the following week on July 30, 2024.

47.  On July 29, 2024, SALANOA reached out to the CHS via text messages from SALANOA's Cell Phone and asked the CHS to confirm s/he was still available to complete the transaction.  The CHS confirmed s/he was available for the transaction and asked SALANOA to confirm they were still discussing the previously agreed methamphetamine and the Ruger FN 5.7 firearm.  SALANOA confirmed and offered to resupply the CHS with M30 pills as well.  The CHS declined the

offer to resupply with M30 pills at the time.

*Controlled Buy of One Pound of Methamphetamine and a Firearm from SALANOA*
*on July 30, 2024.*

48.     On July 30, 2024, the CHS purchased one pound of methamphetamine and a Ruger FN 5.7 handgun from SALANOA for $2700.  This controlled buy was surveilled by undercover law enforcement and the meeting between the CHS and SALANOA was surreptitiously recorded.  The CHS' vehicle and person were searched by law enforcement for contraband both before and after the controlled buy.

49.     Earlier the same day, the CHS contacted SALANOA via text messages and asked SALANOA to confirm that the total amount for the transaction was still $2700—that is, $1100 for one pound of methamphetamine and $1600 for the Ruger FN 5.7 firearm.  SALANOA confirmed the total price was $2700.  Later the CHS called SALANOA's Cell Phone again to set up the meeting time and location.  The CHS and SALANOA agreed to meet in the parking lot of the Maher Court Apartments in Vallejo, CA.

50.     On July 16, 2024, this court authorized a Cell Phone Ping search warrant for SALANOA's cell phone for a period of 30 days.  I monitored the phone ping data received by the FBI from T-Mobile pursuant to the search warrant.  Based on the review of the phone ping data it appeared that prior to the controlled buy operation SALANOA was consistently located in South Vallejo.  It should be noted that 120 Maher Court, Vallejo CA, was not in the radius covered by the phone pings for SALANOA's Cell Phone.

51.     FBI surveillance units established surveillance in the vicinity of 120 Maher Court, Vallejo, CA, prior to the arrival of the CHS.  Surveillance units observed a black Honda Civic, bearing the California License Plate 8SRD444, parked at 120 Maher Court.  Surveillance units observed SALANOA exit the rear passenger door of the black Honda and walk towards the front door of the apartment located at 120 Maher Court, Vallejo, CA.  SALANOA entered the apartment through the front door.  SALANOA was not carrying anything while walking towards the apartment.  Several minutes later, surveillance units observed SALANOA exit the apartment carrying an orange bag with black handles.  Surveillance units observed SALANOA returning to the black Honda with the orange

bag.

52.     Surveillance units observed the CHS arrive in the parking lot of the Maher Court apartments.  Surveillance units observed SALANOA walking towards the CHS' vehicle.  The CHS advised the driver of the Honda was Jesse CAMPOS.  E. SILVA was in the front passenger seat and Anguiano was standing behind the black Honda.  The video recording shows SALANOA entering the CHS' vehicle.  The CHS reported that SALANOA entered the CHS' vehicle holding an orange bag.  The CHS reported that SALANOA removed the agreed upon Ruger firearm and methamphetamine from the orange bag and gave it to the CHS.  The CHS provided $2700 to SALANOA.  Although the video recording does not capture the CHS giving the money to SALANOA, the two could be heard counting money while discussing future transactions.

53.     The video recording revealed that SALANOA told the CHS that he had cocaine available at a good price, but he needed to know a week in advance if the CHS wanted to purchase cocaine. SALANOA told the CHS the firearm was equipped with a light, which takes an android USB charger and needs to be charged.  SALANOA told the CHS that he had to return the Draco and asked the CHS if s/he still wanted to purchase the Draco.  The CHS told SALANOA s/he would let him know regarding future buys.  SALANOA told the CHS to give him a days' notice before the next buy and he would be ready.

54.     The CHS left the meeting location under constant surveillance.  The CHS met with handling agents after the controlled purchase operation at a predetermined location and turned over the package SALANOA had given the CHS, which contained a Ruger FN 5.7 handgun with serial number 641-51464 and a clear plastic bag containing clear crystal-like substance.  The firearm had a magazine containing 16 rounds of 5.7 FN ammunition, which was seated in the magazine well of the firearm.  On August 30, 2024, the DEA Western laboratory conducted a chemical analysis of the drugs purchased from SALANOA on July 30, 2024.  The chemical analysis testing conducted by the DEA laboratory identified the substance to contain Methamphetamine Hydrochloride with a net weight of approximately 442.6 grams and a substance purity of approximately 99%.

1
2
3
4
5
6
7
8
9



*Figure 7: Narcotics and firearm purchased from SALANOA on July 30, 2024*

10

11      55.    On August 11, 2024, SALANOA contacted the CHS via text messages from

12  SALANOA's Cell Phone asking if the CHS needed anything.  The CHS explained to the FBI that s/he

13  interpreted this as a resupply offer.  The CHS did not respond to SALANOA.

14      56.    On August 20, 2024, SALANOA contacted the CHS via text message from SALANOA's

15  Cell Phone asking if the CHS needed anything.  The CHS explained to the FBI that s/he interpreted this

16  as a resupply offer.  The CHS responded to SALANOA that s/he was "good" and thus declined

17  SALANOA's resupply offer.

18      57.    On September 23, 2024, the SCVCTF conducted physical surveillance in South Vallejo

19  in efforts to locate SALANOA's residence.  The FBI was receiving cell phone location data for

20  SALANOA's Phone pursuant to a Search Warrant authorized by this Court on September 6, 2024, for

21  30 days.  The cell phone location data suggested SALANOA's Cell Phone was located in South Vallejo

22  between Magazine Street and Lemon Street.  Surveillance units located a black Mercedes resembling

23  SALANOA'S VEHICLE backed into the driveway of 616 Grant Street, Vallejo, CA, which was

24  consistent with the location data for SALANOA's Cell Phone.  The Mercedes did not have a front

25  license plate.  The FBI conducted an open-source Law Enforcement database check for 616 Grant

26  Street, Vallejo, CA, which revealed that the residence was associated with E. SILVA.  On September 30,

27  2024, I conducted a spot check surveillance of 616 Grant Street, Vallejo, CA, and observed that E.

28  SILVA'S VEHICLE was parked on the driveway of 616 Grant Street, Vallejo, CA (SALANOA'S

RESIDENCE). The Mercedes resembling SALANOA'S VEHICLE was backed into the driveway of the residence with no front license plate visible.

58.     On September 30, 2024, SALANOA contacted the CHS again via text message from SALANOA's Cell Phone, asking if the CHS needed anything. The CHS explained to the FBI that s/he interpreted this as a resupply offer. The CHS did not respond to SALANOA.

59.     On November 13, 2024, handling agents tasked the CHS to reach out to SALANOA and inquire about a potential purchase of M-30 pills the following week. The CHS contacted SALANOA at SALANOA's Cell Phone and inquired if SALANOA would be available to supply the CHS with M-30 pills and if the price for the narcotics was still the same. SALANOA responded that he was planning a trip to Los Angeles but that he would be available for the transaction the following week. SALANOA confirmed that the price for the narcotics was still the same.

60.     On November 18, 2024, the CHS reached out to SALANOA via text message and inquired if SALANOA would be available for the previously discussed purchase of M30 pills the next day. SALANOA confirmed he would be available.

***Controlled Buy of M30 Pills from SALANOA on November 19, 2024.***

61.     On November 19, 2024, the CHS met SALANOA in Vallejo, CA, and purchased approximately 4000 M30 pills for $4800. This controlled buy was surveilled by undercover law enforcement and the meeting between SALANOA and the CHS was surreptitiously recorded with a video and audio recorder. The CHS' vehicle and person were searched by law enforcement for contraband both before and after the controlled buy.

62.     Prior to the controlled buy, SALANOA reached out to the CHS via text messages from SALANOA's Cell Phone and asked the CHS to let him know regarding the previously discussed purchase of M30 pills. Because the CHS did not respond to SALANOA's text message right away, SALANOA messaged and audio called the CHS from the Instagram account "blkboichuy." Later the same day, the CHS called SALANOA's Cell Phone to discuss the transaction. The CHS ordered four boats (4000) of M30 pills and told SALANOA s/he would be available to meet SALANOA later the same day to complete the transaction. SALANOA told the CHS to text him when the CHS was ready

1   and he (SALANOA) would provide the CHS an address for their meeting.  Later the same day, the CHS

2   texted SALANOA and requested the address.  SALANOA instructed the CHS to meet him at 801

3   Cherry Street and asked the CHS to let him know when the CHS was 10 minutes out.

4       63.     Law enforcement established surveillance in the vicinity of SALANOA'S RESIDENCE

5   prior to the controlled buy.  Surveillance units observed SALANOA and E. SILVA cleaning the front

6   yard of the residence prior to SALANOA's meeting with the CHS.  SALANOA was wearing a gray

7   sweat suit.  Later the same day, surveillance units observed SALANOA and E. SILVA departing the

8   residence in E. SILVA's VEHICLE.  E. SILVA was observed entering the driver door of the vehicle

9   while SALANOA entered the front passenger door.  Surveillance units attempted to monitor the

10  movement of E. SILVA'S VEHICLE but lost it in traffic.  E. SILVA's VEHICLE returned back at the

11  residence before SALANOA's meeting with the CHS.  Both E. SILVA and SALANOA were observed

12  exiting the vehicle with what appeared to be fast food in their hands.

13      64.     The CHS drove to the controlled buy location under constant surveillance and parked at

14  the intersection of 5th St. and Cherry St. in Vallejo, CA.  After arriving at the buy location, the CHS

15  called SALANOA's Cell Phone and informed SALANOA that s/he arrived at the previously agreed

16  location.  The recording which captured their phone conversation revealed that SALANOA told the

17  CHS that he was on "his way."  Shortly after the CHS called SALANOA, surveillance units observed

18  SALANOA'S VEHICLE departing SALANOA'S RESIDENCE.  Surveillance units monitored the

19  movement of SALANOA'S VEHICLE to the corner of 5th St. and Cherry St. in Vallejo, CA.

20  Surveillance units observed SALANOA'S VEHICLE stopping next to the CHS's vehicle and the CHS

21  entering the front passenger seat of SALANOA'S VEHICLE.  SALANOA drove the CHS to the end of

22  the street, made a U-turn and parked in front of 801 Cherry St.  The CHS reported that SALANOA was

23  wearing a gray sweat suit and removed the agreed upon 4,000 M30 pills from his front hoodie sweatshirt

24  pocket.  The CHS reported that SALANOA handed the CHS four packages of 1000 pills.  The CHS

25  placed the four packages of fentanyl pills into the CHS' backpack.  The CHS handed SALANOA $4800

26  for the narcotics and SALANOA counted the money.  Although the video recording does not capture the

27  CHS handing the money to SALANOA, the audio recording captures the moment when the CHS was

28  counting the cash and giving SALANOA one thousand at a time followed by eight hundred at the end.

65.     The recording revealed that during their meeting SALANOA asked the CHS about a previous conversation they had on Telegram regarding check fraud.  The CHS had previously reported this Telegram conversation in which SALANOA attempted to involve the CHS in a check fraud scheme.  During the recorded meeting SALANOA explained to the CHS how he commits check fraud.  SALANOA advised he buys checks and then provides the checks to people to deposit into their credit union accounts.  Once the checks clear, the person who deposited the check immediately withdraws the money and then the money is split 60/40 or 70/30 with SALANOA.  SALANOA offered the CHS again to engage in check fraud with him.

66.     During the recorded conversation, SALANOA told the CHS that he had a "Draco" style firearm for sale for $3000 and a "long A" style firearm for sale for $1000.  SALANOA advised the Draco had a 50 round drum magazine and the long AK had a scope.  SALANOA also told the CHS to let him know if the CHS wanted "clear."  SALANOA added that he had "waters" for sale as well.  Based on my training and experience, I know that "clear" is a slang term used for methamphetamine and "waters" is a slang term used for pounds of methamphetamine.

67.     The CHS reported that during their meeting, SALANOA had a Glock firearm sitting in the door panel of the Mercedes on the driver side.  The CHS advised the Glock was resting in the door panel close to the door handle.

68.     The CHS walked back to his/her vehicle with the narcotics and returned to the meet location with CHS handlers under constant surveillance.  The CHS met with handling agents and turned over the package SALANOA had given the CHS.  The suspected drugs weighed approximately 433.3 grams in its original packaging.  The suspected drugs were provided to the CHS in four separate clear plastic bags containing blue M30 pills.  While these suspected M30 pills have not yet been tested, agents have subsequently visually inspected the drugs.  The pills purchased from SALANOA were blue in color and had the letter "M" printed on one side of the pill and the number "30" printed on the other side of the pill.  Based on my training and experience, these pills are of a consistent size, shape, and color to actual M30 pills.  Based on my training and experience, M30 pills sold by drug dealers are known to contain fentanyl.



*Figure 8: Narcotics purchased from SALANOA on November 19, 2024.*

69.    On December 11, 2024, SALANOA contacted the CHS via text messages and inquired if the CHS wanted to "check out the other shit."  The CHS explained that s/he understood that SALANOA was offering to show the CHS the firearms previously discussed during the controlled buy operations of M30 pills.  The CHS asked SALANOA if he could send pictures of the firearms on the text message thread or if he (SALANOA) preferred Telegram.  SALANOA told the CHS he preferred Telegram.

70.    On December 18, 2024, the CHS reached out to SALANOA via Instagram and requested pictures and prices for the two firearms.  SALANOA sent the CHS pictures of an AR style rifle and a Draco via Instagram.  SALANOA offered to sell the CHS the AR style rifle for $1300 and the Draco for $2800 if the CHS would purchase just the firearm.  SALANOA told the CHS the price of the Draco would be $3000 if SALANOA would include a drum magazine and ammunition with the firearm.



*Figure 9: Photographs of firearms SALANOA offered to sell the CHS.*

71.    On December 30, 2024, and January 7, 2025, SALANOA reached out to the CHS via text messages from SALANOA's Cell Phone but the CHS did not reply to SALANOA's test messages.  On January 13, 2025, SALANOA texted the CHS: "Yoo pri hit me."  The CHS understood that message to be a resupply offer from SALANOA and replied that s/he was trying to stay low at the moment, thus declining SALANOA's offer.

### *Training and Experience Regarding Drug/Firearm Trafficking and Drug/Firearms Traffickers*

72.    As a result of my training and experience, I know that the traffickers who deal in controlled substances and firearms, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions.  Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of the co-conspirators.  These records may be kept on paper or contained in memory calculators or computers.  It is also my experience that these traffickers tend to keep these accounts and records in their residences and in the areas under their control.  It is my training and experience that in the case of drug dealers, evidence is likely to be found where the dealers live.  It is also my training and experience that where criminal activity is long term or on-going, equipment or records of the crime will be kept for some period of time.

73.    I have learned that large-scale drug and firearms traffickers often have on hand large

amounts of United States currency in order to maintain and finance their ongoing business. It has been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles, and other items of value and/or proceeds of drug transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

74.    In my experience, drug traffickers commonly have in their possession, that is on their person, at their residence, in their vehicles, and in the areas under their control, firearms, included but not limited to handguns, pistols, revolvers, shotguns, rifles, machine guns, and other weapons. Such firearms are used by criminals to protect their illicit trafficking operations, and themselves against law enforcement and others because the illicit drug and firearms trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug proceeds.

75.    In my experience, traffickers commonly have in their possession, that is on their person, at their residence, in their vehicles, and in the areas under their control and which they have free and ready access to drugs and firearms, which they intend to distribute. It is my experience that these traffickers commonly utilize these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

76.    In my experience, traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product. Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

77.    In my experience, large scale traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver licenses, employment cards, insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and utilized in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

78.    In my experience, drug traffickers often utilize vehicles in which to transport and distribute controlled substances in facilitation of their trafficking activities. It has also been my experience that traffickers will also utilize the vehicles as locations in which to store controlled

substances and guns prior to distribution.  During prior investigations, I have observed that traffickers will often utilize vehicles registered in the names of individuals other than themselves in an effort to avoid detection by law enforcement.

79.     In addition, drug and gun traffickers often tend to attempt to legitimize their assets by establishing domestic and foreign businesses, by creating shell corporations, by utilizing foreign bank haven countries and attorneys specializing in drafting and establishing such entities employed to "launder" proceeds derived from the distribution of controlled substances.

80.     Individuals involved in the distribution of guns and drugs often make, or cause to be made, pictures videos, movies, compact discs, or other such items which are or contain photographic or digital images in order to memorialize their narcotics distribution, use, possession, or any other activities surrounding their trafficking activities, and that such items often identify co-conspirators in their trafficking activities.

81.     It has been my experience in the past, and particularly in this case, that when suspects use mobile phones to communicate with cooperating individuals or undercover agents to set up their illegal transactions, records relating to these activities will be found stored in the cellular telephone.

82.     I know that traffickers use mobile phones to communicate with one another, either by voice or text message.  Mobile phones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the phone numbers of other traffickers and the dates and times that they and/or the mobile phone user dialed one another's telephones.  Mobile phones also contain in their memory a telephone book.  This allows the user to store telephone numbers and other contact information; the information stored in a phone used by a trafficker is evidence of the association of the trafficker, some of which is related to his or her illegal business.  Mobile phones also have a voice mail function that allows caller to leave a message when the user does not answer.  Traffickers sometimes leave voice messages for each other, and this is evidence both of their mutual association and possibly their joint criminal activity.  Mobile phones can also contain other user-entered data files such as to-do lists, which can provide evidence of crime when used by a trafficker.  Mobile phones can also contain photographic data files, which can be evidence of criminal activity when the user was a trafficker who took pictures of evidence of crime.

AFFIDAVIT

83.     As described in the Attachments A-1 through A-5, this affidavit seeks permission to search and seize things that are related to the drug/firearms-trafficking activities between SALANOA and his co-conspirators and accomplices, in whatever form such things are stored.  Based on my training and experience, I know that electronic devices can store information for long periods of time.  Even when a user deletes information from a device, it can sometimes be recovered with forensic tools. Similarly, things that have been viewed via the Internet, are typically stored for some period of time on the device.  This information can sometimes be recovered with forensic tools.

84.     It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators to whom I have spoken to, that the items listed in the respective Attachment B are items most often associated with the distribution of controlled substances as well as the proceeds from such illegal operations.

85.     Individuals involved in drug and gun trafficking also often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances.  Therefore, I am requesting authority to seize all items listed in Attachment B to this affidavit and incorporated here by reference.

## CONCLUSION

86.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in each respective Attachment A and seize the items described in each respective Attachment B.

**REQUEST FOR SEALING**

87.　　It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,


　/s/ Nathan Cernat
Nathan Cernat
Special Agent
FBI

Subscribed and sworn to me via telephone on:　February 24, 2025


The Honorable Jeremy D. Peterson
UNITED STATES MAGISTRATE JUDGE


　/s/ R. Alex Cardenas
Approved as to form by AUSA R. ALEX CARDENAS